UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW MEXICO

In re:
WILLIAM P. MONTANO,
    Debtor.                      No. 7-05-14469 SA

KATHY MAE MONTANO,
    Plaintiff,
v.                           Adv. No. 05-1195 S

WILLIAM P. MONTANO,
    Defendant.

**MEMORANDUM OPINION IN SUPPORT OF JUDGMENT
DENYING COMPLAINT CONTESTING DISCHARGE AND DISCHARGEABILITY**

The complaint of Plaintiff Kathy Montoya against

Defendant/Debtor William Montano came before the Court for a

trial on the merits on August 17, 2006.  Having considered the

evidence and the law, the Court finds that the complaint which

seeks to deny Debtor his discharge and alternatively which seeks

to have declared nondischargeable the debt owed for the former

second mortgage should be dismissed.[1]

**Background**

The parties married in 1978 and divorced in 2000 in

Albuquerque, New Mexico.  The marital settlement agreement

---

[1] The Court has subject matter and personal jurisdiction
pursuant to 28 U.S.C. §§1334 and 157(b); this is a core
proceeding pursuant to 28 U.S.C. §157(b)(2)(I) and (J); and these
are findings of fact and conclusions of law as required by Rule
7052 F.R.B.P.  The underlying chapter 7 case was filed prior to
the effective date of the analogous provisions of the Bankruptcy
Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No.
109-08, 119 Stat. 23 ("BAPCPA"), and therefore the changes
enacted by that legislation are not applicable to this adversary
proceeding.

Page 1 of  23

Case 05-01195-s   Doc 28   Filed 01/26/07   Entered 01/26/07 13:44:51 Page 1 of 23

("MSA), dated November 24, 2000 and filed in the Second Judicial District Court case on November 29, 2000, provides explicitly that "[e]ach party waives any right to alimony." Pl Ex 1; Def Ex 1. The MSA, drafted in large part by Debtor, divided the debts and the assets between the parties, as equally as possible, which according to Plaintiff was the intention of the parties. And it provided that Debtor (petitioner in the divorce case) would keep the real property on General Hodges NE and be responsible for the mortgage on that property. The MSA also provided that Plaintiff would keep the couple's home on Westridge NW and be responsible for the first mortgage to Wells Fargo but that Debtor would be responsible for the second mortgage to Homecomings Financial for $75,000. The MSA did not address a fourplex on Mountain Road, but the parties treated it and the related debt as Debtor's. Similarly, Plaintiff kept her cat breeding and cat products business even though that business was not addressed by the MSA.

At the time the parties divorced, Debtor held a middle management position at Home Depot; he subsequently lost that job and has since made his living as a handyman. His income has steadily declined from $78,000[2] in 2000 (Pl Ex 19 – CY 2000 form 1040 adjusted gross income) to $38,000 in 2001 (Pl Ex 20), $39,000 in 2002 (Pl Ex 21) (in addition, Debtor made about

---

[2] Except as otherwise shown, the Court has used rounded off numbers.

Case 05-01195-s    Doc 28    Filed 01/26/07    Entered 01/26/07 13:44:51 Page 2 of 23

$20,000 from the sale of the General Hodges property, which he invested in the purchase of his current residence), $20,000 in 2003 (Pl Ex 22) to $2,179 in 2004 (Pl Ex 23). His Schedule I now shows $1425 in income, plus $750 from his live-in fiancee, for a monthly total of $2,175.

The evidence made clear that the income figures Debtor reported to the IRS for 2003 and 2004 are understated. For example, Debtor's bank statements showed him receiving almost $9,000 of additional income in 2004, which he guessed came from remodeling the kitchen of their daughter Becky. In addition, Debtor used his connections with Home Depot and Home Base personnel (perhaps through employee discounts) to obtain materials below retail not only for his own handyman projects but also for third persons. Debtor described the supplying of materials to third persons as "conduits" and derived some additional and almost certainly unreported income from the "conduits". Taking into account the discrepancies in Debtor's testimony and the exhibits (Pl Ex 24 in particular), his current income is likely not much more than he reported on his Schedule I.

Plaintiff is employed as a quality control specialist on the assembly line at Intel. Her IRS returns for 2003 and 2004 show adjusted gross incomes of $42,000 and $53,000 respectively (Pl Exs 16 and 17), and her W-2 for 2005 shows $47,000 (Pl Ex 18).

Case 05-01195-s    Doc 28    Filed 01/26/07    Entered 01/26/07 13:44:51 Page 3 of 23

In 2000, the parties' daughter Amy had total back reconstruction surgery. The follow up care for the surgery required Plaintiff to drive Amy to and from Denver every three weeks. These trips, together with the monthly house payments that were so high that she risked falling behind on them, necessitated opening up two credit card accounts some time after the divorce. When Plaintiff began to make late payments on the second mortgage due to Debtor's late payment to her, the interest rates on her credit card debt through the magic of universal default provisions skyrocketed from %5 and 7% to 25% and 26% respectively. These rates, together with losses from the cat business, led Plaintiff to refinance her home. Because of her credit status, and probably because of the lack of equity in her home, Plaintiff was able to obtain only an "80/20" loan; that is, a first mortgage to New Century (since assigned to Chase Home Finance) for $228,000 at a rate of 5.9% (Pl Ex 12; doc 9) and the second to New Century (now with Wilshire) for $56,000 at 10.35% (Pl Ex 14; doc 10). (The New Century second mortgage replaced an earlier second mortgage that had a 12.875% interest rate. Pl Ex 2.) However, at the time of the refinance, Debtor executed a promissory note to Plaintiff for $73,000 at 7.9% (Pl Ex 11) as a substitute for Debtor to pay instead of paying directly on the new second mortgage note, so that Debtor's monthly payments were reduced from over $800 on the Homecomings mortgage note to $560

Page 4 of 23

on the note.  (Plaintiff testified she did this in order to make his payment burden easier and therefore make it more likely he would actually make the payments on time.)  The $228,000 first mortgage note is almost five times larger than Plaintiff's maximum income; the size of the first and second mortgage payments appears to require approximately $1900 in payments each month.[3]  These payments alone must have contributed substantially to the cash flow crisis and then to the filing of a chapter 7 petition in May 2005 (Def Ex 34) (case no. 7-05-13866, District of New Mexico).

Plaintiff had struggled to avoid her financial difficulties and pay her creditors.  Anticipating (albeit inadvertently) one of the requirements of BAPCPA, she engaged a debt consulting company to prepare and implement a debt repayment plan.  The company took her money but consistently paid at least one creditor sixty days late.  That meant that she had to suddenly double up on certain payments, and her credit rating suffered more.  With the debt repayment plan not having worked, short on income, and unable to see how she could pay the second mortgage (and other debts), Plaintiff filed her petition.

In 2005 Intel changed its employment compensation from the

---

[3] These figures do not appear in response to question 3 of the Statement of Financial Affairs (requiring a list of all the payments made to creditors in the ninety days immediately preceding the filing of the petition); however, Schedule J and the reaffirmation agreements (docs 9 and 10) confirm the figures.

"California" method to the "New Mexico" method (her shorthand descriptions), and as the labels imply, her income dropped. In addition, she began suffering bouts of vertigo for sustained periods of time. She then suffered a nervous breakdown. She is also suffering from post traumatic stress disorder arising from earlier events in her life. She has been undergoing therapy and counseling for several years now. Despite the various medications and treatments, she has repeatedly had to take short term medical leave. That drops her income substantially. By April of this year, unless things improve, she will move to permanent disability status, which will leave her with even less income. It is certainly possible that beginning in April 2007 almost her only income will be permanent disability payments of $938 every two weeks, or about $2,032 monthly.

Plaintiff's initial Schedule I showed monthly income of $3,884 (May 2005), which included $560 from Debtor for the second mortgage. It also included $133 from her businesses -- cats and "internet garage" sales. (The latter business was started to provide Amy with a source of income while Amy stayed home with her son when her baby, Plaintiff's grandchild, was in an intensive care unit. The business lost money in 2004 and 2005, but generated a slight profit in 2006.) Her amended Schedule I, filed with the help of her current counsel in September 2005 (doc 15), shows no income from her employment but slightly over $3,000

Case 05-01195-s   Doc 28   Filed 01/26/07   Entered 01/26/07 13:44:51 Page 6 of 23

in income from her cat and cat products business.  Since then, however, disease decimated her cats, and her own medical condition required that she get rid of the remaining cats, so that source of income has ended.  It is certainly possible although not certain that beginning in April 2007 she will be earning only $938 every two weeks.

In July 2005, Plaintiff, with the approval of her initial chapter 7 bankruptcy counsel (not the counsel listed below), decided to attempt to keep her home.  In consequence, she reaffirmed the enormous debts whose mortgages encumbered her home.  As of the trial date the balances on the first and second mortgages together totaled $278,000.  In her schedules she valued the home at $285,000.  Were she to sell the home for that amount and pay approximately 5% in real estate commissions and closing costs (the standard 6% realtor commission split between her and the buyer, plus 2% for title insurance, survey, recording fees, attorney review fees, etc.) – about $14,250, she would realize almost $271,000 and be left with a debt of about $7,000 owing to Wilshire.  This analysis does not take into account the possibility that the home may now be worth less than the $285,000 she scheduled it at in May 2005; the mortgage company's appraisal had put the value at $270,000.  A sale at that gross sales price, combined with her paying the entire 6% sales commission, would leave a deficiency owed to Wilshire of approximately $30,000

Case 05-01195-s    Doc 28    Filed 01/26/07    Entered 01/26/07 13:44:51 Page 7 of 23

(278,000 - $248,400).  And the recent softening of the real estate market may mean that the home has a market value of even less than $270,000.  So, depending on the sales price and transaction costs, were Plaintiff to sell her home to pay off the mortgage debt, she could be liable for a deficiency that is as little as $7,000 or as large as $30,000 or more.

Of course, Plaintiff is not selling her home and retiring the debt.  She therefore continues to be liable on both mortgages.

In effect Plaintiff is now saddled with a significant housing debt (or a deficiency judgment debt in the event of a foreclosure or sale for less than what she owes on the house) that is not subject to discharge until, at the earliest, some time after May 2009 (if she is able to file and successfully complete a chapter 13 case) or May 2013 (chapter 7).  Making matters worse is that the first mortgage is an adjustable rate note.  Pl ex 12.  Although the rate was locked in at 5.9% for the first two years, beginning in June 2006 it may increase or decrease by as much as 1.5% every six months, with a floor of 5.9% and a ceiling of 12.9%.

Following the execution of the MSA, Debtor made the monthly payments on the original second mortgage, albeit not consistently on time.  When Plaintiff refinanced the house and Debtor executed the note, his monthly payment decreased from over $800 to $560.

Case 05-01195-s   Doc 28   Filed 01/26/07   Entered 01/26/07 13:44:51 Page 8 of 23

Plaintiff testified that Debtor was grateful for the lower payment amount, and for a number of months paid those lower monthly payments, until Plaintiff filed her bankruptcy petition.

It is the debt represented by the promissory note that Plaintiff seeks to have held nondischargeable. Debtor argues that this is not the same debt as he agreed to pay in the MSA. Plaintiff asserts that this is the replacement debt (the original not having been paid by Debtor but rather refinanced by her) for which the MSA makes him liable. Plaintiff argued this debt effectively constitutes alimony to her (§523(a)(5)) or that he can pay the debt and it would be more harmful to her for him not to pay the debt (§523(a)(15)). Debtor disputes these assertions.

**Analysis**

The complaint seeks relief in part for violations of §727(a), based largely on Debtor's initial schedules[4] which purported to list his Los Lunas home as only half owned by himself. Plaintiff claimed that Debtor was fraudulently claiming that Plaintiff was the other half owner. It is true that the initial schedules were somewhat defective in explaining the background that the amendments to the schedules and the Debtor's

---

[4] The Court notes that Debtor has listed "camera/pistol" in response to question 8 of his amended Schedule B. Presumably these are two different items, although with the proliferation of cell phone cameras, cell phone music players (recently introduced by Apple), multifunctional Blackberrys, Treos, and PDAs, etc., the introduction of a "camera/pistol" would not be altogether surprising.

testimony have clarified: Debtor is purchasing his home on a real estate contract (Pl Ex 9) and therefore has no fee simple interest yet, and anticipated that if and when he married his fiancee, whose income is also directly or indirectly contributing to the payments on the real estate contract, she would be a half owner of the interest in the property. There was clearly no fraudulent intent on the part of the Debtor, merely an initially inept expression of what was intended which was no fault of the Debtor.

Plaintiff also claims that the second mortgage debt is nondischargeable under either subsections (5) or (15) of §523. Debtor's initial argument, that the refinancing of the Homecomings mortgage discharged his obligation to pay the second mortgage replacement note, borders on the absurd, and Debtor's making the argument damages his credibility. While it is true that the MSA specifically identifies the Homecomings mortgage as the debt to be paid, the MSA was not crafted by high-powered attorneys keen to anticipate every possible contingency in the parties' post divorce financial and emotional lives. (In fact, it was largely drafted by Debtor, perhaps with the help of a non-lawyer.) In consequence, the short and plain statement of the parties' agreement that is the MSA is best read in light of the parties's intentions, one of which was to divide the debts and assets equally. Shifting this debt to Plaintiff would have

Case 05-01195-s    Doc 28    Filed 01/26/07    Entered 01/26/07 13:44:51 Page 10 of 23

radically unbalanced the parties' arrangement. Debtor's actions afterward support this interpretation of the parties' mutual intention; he continued to make the payments on the note until she filed her bankruptcy petition. In fact he was duly appreciative of the reduced payments. His statement that he signed the note merely to "satisfy the argument" between the two of them is equally not credible.[5]

Plaintiff claims that payment of the second mortgage note in effect constituted alimony or spousal support. The MSA explicitly states that neither party is paying alimony. Such a statement in the MSA is not conclusive on the subject, <u>Sampson v. Sampson (In re Sampson)</u>, 997 F.2d 717, 722 (10th Cir. 1993)(section 523(a)(5) requires federal courts to look beyond the label which the parties attach to an obligation), but it is evidence of what the parties were thinking and intending at the time. A payment denominated as something other than support can be treated as support if the parties intended at the time for the payment to serve as support, and if they actually treated the

---

[5] And it is inconsistent with the amount of the debt that was incurred. Plaintiff testified credibly that she had not wanted to borrow up to $75,000, but that Debtor wanted to fix up his rental properties and so the final $25,000 that was borrowed went entirely to him for that purpose. Although equal distribution of debts and assets was the governing principle behind the allocations of the MSA, it would be somewhat incongruous were Debtor to have gotten the money for his rentals and then left her in the end saddled with repayment of that part of the debt. However, this incongruity is not a reason for declaring the debt nondischargeable.

Case 05-01195-s    Doc 28    Filed 01/26/07    Entered 01/26/07 13:44:51 Page 11 of 23

payments as support when they were made.  Id. at 723.  Neither of

those criteria are met here.  Neither party testified that the

payments were intended as support by the parties at the time of

executing the MSA, nor that they subsequently treated the

payments that way.  Indeed, Plaintiff candidly testified that

both parties intended the MSA to divide the assets and

liabilities as evenly as possible between them.  There is thus no

evidentiary basis for refusing to discharge the debt pursuant to

§523(a)(5).

The outcome of the analysis under §523(a)(15) is less

obvious.  That subsection provided at the relevant time as

follows:

> A discharge under section 727...does not discharge an
> individual debtor for any debt...to a spouse, former
> spouse, or child of the debtor and not of the kind
> described in paragraph (5) that is incurred by the
> debtor in the course of a divorce or separation or in
> connection with a separation agreement, divorce decree
> or other order of a court of record...unless
> (A) the debtor does not have the ability to pay such
> debt from income or property of the debtor not
> reasonably necessary to be expended for the maintenance
> of support of the debtor or a dependent of the debtor
> and, if the debtor is engaged in a business, for the
> payment of expenditures necessary for the continuation,
> preservation, and operation of such business; or
> (B) discharging such debt would result in a benefit to
> the debtor that outweighs the detrimental consequences
> to a spouse, former spouse, or child of the debtor....

Plaintiff (creditor) bears the burden of coming forward with

evidence that the debt in question arises from an MSA and

therefore fits within §523(a)(15).  See §523(c)(1) (creditor must

Case 05-01195-s   Doc 28   Filed 01/26/07   Entered 01/26/07 13:44:51 Page 12 of 23

initiate nondischargeability action); 4 A. Resnick and H. Sommer,
Collier on Bankruptcy (15th Ed. Rev. 2006) ¶523.21[2]. "The
burden of proof then shifts to the debtor to establish that the
debt is dischargeable because the conditions set forth in either
subparagraph (A) or subparagraph (B) exist." Id. (Footnotes
omitted.)

Subsection (A) permits the debt to be discharged if the
debtor does not have the ability to pay.[6] "[I]n considering the
debtor's income, the court should take into account, not only the
debtor's current income, but also the debtor's income earning
ability and potential future income." Id., ¶523.21[3].
(Footnote omitted.)

To begin with, Debtor has some credibility problems on this
front also. He falsified his 2003 and 2004 IRS returns (Pl Exs
22 and 23) by failing to list income. So the question arises
whether his Schedules I and J are accurate. His Schedule I now
shows monthly income of $1425 from his handyman business plus
$750 from his live-in fiancee, for a monthly total of $2,175.

---

[6] Because the Court finds that neither condition or set of
circumstances of §523(a)(15) justifies holding the debt
nondischargeable, the Court does not need to decide whether a
finding that the Debtor cannot pay the debt precludes the need to
consider the balance of harm test. However, separating
subsections A and B with an "or" rather than an "and" suggests
that meeting the requirements of either subsection A or
subsection B is sufficient to end the inquiry. The legislative
history, quoted below, seems to provide further support for this
interpretation.

Case 05-01195-s   Doc 28   Filed 01/26/07   Entered 01/26/07 13:44:51 Page 13 of 23

His Schedule J shows expenses of $3635, for a net monthly loss of $1460. However, based on the evidence presented, the Court cannot find that any amounts of underreported income are likely very substantial. A yearly income of $17,000 ($1,425 x 12) is much more credible than $2,179. Plaintiff presented no additional evidence that suggested Debtor materially falsified his Schedules I and J. As a result, the conclusions reached by the Court are based on the finding that Debtor's current income is sufficiently accurately stated in his Schedule I.

In addition, there was no evidence that Debtor could, if he wanted, increase his income so substantially that he could put his budget into the black. For example, Debtor's explanation that he was having some conflicts with his superiors that led to his leaving Home Depot tells this Court (in the context of the rest of the testimony) that going back to Home Depot, especially in a higher paying position, is out of the question. And while the Debtor gave as his reason for not wanting to return to Home Depot his intention to obtain a general contractor license, there is no evidence that Debtor is actually on his way to doing that. Similarly, a review of his amended Schedules A and B discloses no additional non-exempt assets, the liquidation of which would materially aid Plaintiff. As with the majority of chapter 7 filers in this district, Debtor has relatively few assets, regardless of whether they are exempt or not.

For the most part, Debtor's expenses do not seem to be inappropriately high. The $200 for "pet care" is high, unless the "pets" are generating some income or otherwise performing some useful function for the family. On the other hand, the $200 is relatively small compared to the total of the other expenses, and reducing it to a reasonable figure would still not meaningfully change the monthly financial picture for Debtor and his fiancee. Nevertheless, the Court will subtract the $200 from the expense figures of Schedule J, leaving $3,435.

Schedule J includes a "payment to ex-wife" of $532.[7] But because Debtor is not making this payment, the monthly expenses for him and his fiancee should be listed as $2,903, or about $35,000 yearly. So even without making the payment on the replacement note, Debtor is underwater each month by $728 ($3,636 - $200 - $532 - $2,175 [income]). Plaintiff presented no specific evidence that these figures were false (as opposed to the false IRS returns for 2003 and 2004). In consequence, while Debtor's credibility is questionable, there is no concrete basis for finding that Debtor has significantly more resources for paying the debt than he has disclosed. The statute does not permit the Court to in effect reallocate (that is, hold nondischargeable) the debt based on lack of credibility as such.

---

[7] It is not clear where this figure comes from. The promissory note payment is $560.

Case 05-01195-s    Doc 28    Filed 01/26/07    Entered 01/26/07 13:44:51 Page 15 of 23

Plaintiff testified that when Debtor was still making these payments, which would have been prior to her having filed her petition, she used the funds (at least occasionally) to pay bills and expenses other than the second mortgage. To the extent that Plaintiff is arguing that she needs to be able to continue to do that, she is essentially arguing that the note payments should be treated as spousal support. Given what has been said so far, that argument is unavailing. Therefore the Court finds that as to subsection A of §523(a)(15), the debt is dischargeable.

Determining the outcome of the balancing test of subsection B is more difficult. Debtor clearly needs a fresh start; Plaintiff just as clearly is in dire financial straits. This is a case where there is simply much more debt than either party, or even the parties together, can pay. The one good solution has been eliminated by the reaffirmation agreements[8]; what remains now is merely to, in a sense, allocate responsibility for bearing the burden of paying the second mortgage. To be sure, declaring the debt nondischargeable will not of itself solve Plaintiff's

---

[8] As is apparent from reading this opinion, the Court has assumed that Plaintiff's previous counsel, who signed off on the reaffirmation agreements, did not counsel Plaintiff against entering into them. It is possible he did so but ultimately acceded to Plaintiff's wishes. Other counsel, faced with a debtor client who has insisted on entering into a reaffirmation agreement against the advice of counsel, have refused to approve the reaffirmation agreement and instead have arranged for a hearing at which counsel and the debtor have appeared and which the Court has conducted as if the debtor were not represented by counsel.

Case 05-01195-s   Doc 28   Filed 01/26/07   Entered 01/26/07 13:44:51 Page 16 of 23

problem with the second mortgage; she will continue to be liable on it regardless of what the Court does. Nor will it necessarily result in a penny of actual additional income to her. Only if she is able to use a nondischargeability judgment to pry payments out of Debtor, will Plaintiff derive any financial benefit from the statute.

The balance of harm test promulgated by the statute provides only a general standard. Fortunately, some guidance for applying the balance of harm test enunciated in subsection B appears in the legislative history:

> "The nondebtor spouse may be saddled with substantial
> debt and little or no alimony or support. This
> subsection will make such obligations nondischargeable
> in cases where the debtor has the ability to pay them
> and the detriment to the nondebtor spouse from their
> nonpayment outweighs the benefit to the debtor of
> discharging such debts. In other words, the debt will
> remain dischargeable if paying the debt would reduce
> the debtor's income below that necessary for the
> support of the debtor and the debtor's dependents....
> The debt will also be discharged if the benefit to the
> debtor of discharging it outweighs the harm to the
> obligee. For example, if a nondebtor spouse would
> suffer little detriment from the debtor's nonpayment of
> an obligation required to be paid under a hold harmless
> agreement (perhaps because it could not be collected
> from the nondebtor spouse or because the nondebtor
> spouse could easily pay it) the obligation would be
> discharged. The benefits of the debtor's discharge
> should be sacrificed only if there would be substantial
> detriment to the nondebtor spouse that outweighs the
> debtor's need for a fresh start."

H.Rep. No. 103-835, 103rd Cong., 2nd Sess. 54, <u>reprinted in</u> 1994

U.S. Code Cong. & Admin. News 3363; <u>also reprinted in</u> Colliers

¶523.21[1] at page 523-120.

Page 17 of 23

What the last sentence of the quoted legislative history suggests is that, even with Debtor having the burden of proof on this part of the statute, the debt should be discharged unless there is a particularly good reason not to. On the other hand, the language of the statute -- specifically subsection B of §523(a)(15) -- clearly evidences Congress' intention to protect non-filing (ex)spouses. That would suggest that there not be a presumption of dischargeability. In this instance, and without deciding the issue, the Court has not relied on any presumption of or disposition toward dischargeability to reach its conclusions.

Whether Debtor will be able to benefit from his fresh start given his monthly budget deficit is already questionable.[9] But what is clear is that requiring Debtor to pay an additional $560 per month, thereby in theory at least increasing his budget deficit from $728 to $1288, will make his fresh start much more difficult, if not impossible, to realize. Not driving Debtor deeper into debt is certainly a factor weighing in favor of discharging the debt.

Plaintiff's amended schedule J (doc 15), filed September 15, 2005, shows total expenses of $3,477, of which $1,916 is for the

---

[9] This case is typical of chapter 7 cases with "deficit budgets". That is, a remarkably large number of debtors file a chapter 7 bankruptcy case and then, judging by their Schedules I and J, continue to spend more each month than they earn.

Case 05-01195-s   Doc 28   Filed 01/26/07   Entered 01/26/07 13:44:51 Page 18 of 23

first and second mortgages.  The non-mortgage expenses of $1,561 are individually and in aggregate quite reasonable.  Were Plaintiff to sell her home, she would still need a place to stay.  Even adding back into the non-mortgage figures a reasonable number for rent – say, $800 – puts budgeted expenditures at $2,361.  This compares quite reasonably with the $2,903 that Debtor and his fiancee will be incurring.  The additional $1,116 ($3,477 – $2,361) representing the cost of attempting to hold on to the Westridge house would be, but for the reaffirmation agreements, an extra expense that reasonably should not be Debtor's postpetition liability.

The facts of this controversy raise the question of whether Debtor should be held responsible if Plaintiff has decided to embark on such a perilous and perhaps futile attempt to save her home.  With the filing of her petition, Plaintiff had a specific opportunity to consider all the facts and make a decision whether to continue to be liable on those two debts.  Debtor had nothing to do with that decision; by that time the parties had been long separated and making decisions based on their own interests.  Plaintiff had no basis for assuming that, if Debtor were to file a bankruptcy petition of his own[10], he would be found liable for

_____

[10] Of course, Debtor was not expected to assume that Debtor would file his own bankruptcy petition, only that he could or might.  That is, Plaintiff's then bankruptcy counsel might be expected to anticipate this possibility and counsel Plaintiff accordingly.

Case 05-01195-s   Doc 28   Filed 01/26/07   Entered 01/26/07 13:44:51 Page 19 of 23

helping to pay this debt. Debtor's prepetition payment obligation clearly was not spousal support, and whether the circumstances would turn out that he could afford to make the payment could not be known. That Debtor ceased making the note payments shortly before or when Plaintiff filed her petition might have been a tipoff that collecting from Debtor would be difficult.

These circumstances bring to mind what might be the bankruptcy equivalent of the "eggshell-head rule". See Black's Law Dictionary at 533 (7th Ed. 1999); Martin v. Darwin, 77 N.M. 200, 202, 420 P.2d 782, 784 (1966) ("Where plaintiff has a pre-existing condition and claims that defendant aggravated that condition, plaintiff must prove the extent of that aggravation."); 2 Restatement (Second) of Torts §461 (1965) (Harm Increased in Extent by Other's Unforeseeable Physical Condition); D. Dobbs, The Law of Torts §188 at 464 (2001) ("The foreseeability or risk rule holds the defendant subject to liability if he could reasonably foresee the nature of the harm done, even if the total amount of harm turned out to be quite unforeseeably large.") (Footnote omitted.). In other words, should Debtor be held liable for the Plaintiff in the financial and legal situation she was when he filed his own bankruptcy petition?

Under the facts of this case, the Court thinks not. The

Case 05-01195-s   Doc 28   Filed 01/26/07   Entered 01/26/07 13:44:51 Page 20 of 23

Code's philosophy of looking at the Debtor's ability to pay and of balancing the harm between the parties, enunciated in §523(a)(15), is fundamentally different than the resulting assessment of liability on a person found liable for causing a tort. <u>Compare</u> F. Harper, F. James and O. Gray, The Law of Torts §20.3 at 128-29 (2nd Ed. 1986) (discussing "the modern trend to emphasize compensation of accident victims and broad distribution of their losses rather than a more nearly perfect tracing out of the implications of the fault principle" in the context of multiple tortfeasors) (Footnote omitted.)  When assessing liability, tort law does not look to the ability of the tortfeasor to pay the resulting damages.  On the other hand, that ability to pay is in many ways the very subject of bankruptcy law.

In addition, it makes sense to require a debtor (Plaintiff, this instance) to take into account the consequences on other persons of her decisions when she files a petition.  No doubt non-filers have the obligation to look out for their own interests.  But if a debtor wants to ensure that a non-filer continues to be liable on a claim, the debtor needs to consider whether the non-filer will be held liable, and anticipate the possibility that he will not.  And part of that consideration will be whether it makes sense to reobligate herself on the claim.  In short, and unlike the eggshell-head tort victim,

Case 05-01195-s   Doc 28   Filed 01/26/07   Entered 01/26/07 13:44:51   Page 21 of 23

Plaintiff in her case had a considerable amount of control over the outcome of her liability on the second-mortgage claim and therefore on her need to obtain an additional means of paying the claim. With Plaintiff having that degree of control, requiring Debtor to "take the Plaintiff as he finds her" would only deflect the consequences of an unwise decision on to the person who did not make (and was in no position to influence) the unwise decision.

In consequence, Debtor should not in effect be held liable for the adverse consequences of Plaintiff's decision to continue to be liable on the mortgage debts. This conclusion applies even in light of Plaintiff's testimony that she used the note payments for living expenses rather than applying them to the payment of the second mortgage. Therefore the Court finds that as to subsection B of §523(a)(15), the debt is dischargeable.

**Conclusion**

The MSA was clearly intended to divide assets and liabilities rather than serve as support for Plaintiff. Debtor cannot afford to pay the second mortgage replacement note. Holding that note nondischargeable as to Debtor would serve no useful purpose for Plaintiff unless she were able to actually collect on it; if she were able to squeeze some payment from the Debtor, that collection (or, for that matter, the mere continuing obligation) would obviously impair Debtor's fresh start. In any

Case 05-01195-s   Doc 28   Filed 01/26/07   Entered 01/26/07 13:44:51 Page 22 of 23

event, he should not be saddled with the consequences of her decision to remain liable on the mortgages. The Court finds that Plaintiff has not established the factual predicates for relief under §§727(a) and 523(a)(5) and (15). The complaint must therefore be dismissed. An order will be entered.

_____
James S. Starzynski
United States Bankruptcy Judge

COPY TO:

James Clay Hume
PO Box 10627
Alameda, NM 87184-0627

Michael K Daniels
PO Box 1640
Albuquerque, NM 87103-1640

Philip J. Montoya
Trustee
PO Box 159
Albuquerque, NM 87103

United States Trustee
PO Box 608
Albuquerque, NM 87103-0608